# In the United States Court of Federal Claims

No. 07-597C
(Originally Filed: September 10, 2007)
(Reissued: September 24, 2007)[1]

* * * * * * * * * * * * * * * * * * * * * *

DATA MANAGEMENT SERVICES JOINT VENTURE,

*Plaintiff*,

v.

THE UNITED STATES,

*Defendant*,

and

ALON, INC.

*Intervenor*.

* * * * * * * * * * * * * * * * * * * * * *

Post-Award Bid Protest; RCFC 52.1 Motion for Judgment on the Administrative Record; Protest of Task Order Under Federal Supply Schedule Contract; Evaluation of Quotations; Scope of Federal Supply Schedule Contract.

*Joseph G. Billings*, Bowie, MD, for plaintiff.

*Kenneth D. Woodrow,* United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director, for defendant. *Gary L. Brooks* and *Stephani L. Abramson*, National Archives and Records Administration, of counsel.

---

[1] In accordance with the protective order in this case, publication was deferred pending the parties' review for redaction of controlled materials. Those redactions are indicated by brackets.

*Douglas L. Patin,* Washington, DC, with whom was *Jeremy Becker-Welts*, for intervenor.

____________

OPINION

____________

BRUGGINK, *Judge*.

This is a post-award bid protest action for injunctive and declaratory relief or, alternatively, damages for bid preparation costs, brought by plaintiff Data Management Services Joint Venture ("Data Management") against the United States, acting through the National Archives and Records Administration ("the agency" or "NARA"). Plaintiff objects to the agency's evaluation of the quotation submitted by ALON, Inc., the awardee and defendant-intervenor, in response to Request for Quotes ("RFQ") No. NAMA-07-Q-0004. Plaintiff seeks a declaratory judgment that the agency's evaluation of ALON's quote and subsequent award decision was arbitrary, capricious, and without a rational basis because ALON's quote was allegedly ineligible for award. Plaintiff also requests that, upon finding the evaluation and award decision improper, we enjoin NARA to terminate the task order awarded to ALON and, instead, award the task order to plaintiff.

Pending is plaintiff's motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and defendant and intervenor's cross-motions. The Administrative Record ("AR") has been filed and the matter is fully briefed. Oral argument was heard on September 6, 2007. For the reasons set out below, we deny plaintiff's motion for judgment on the administrative record and request for a permanent injunction, and grant defendant's cross-motion.

BACKGROUND

On November 3, 2006, NARA issued RFQ No. NAMA-07-Q-0004 for the purpose of obtaining technical and administrative staff support for the existing Program Management Office ("PMO") of the agency's Electronic Records Archives ("ERA") program. The ERA program is a significant and ongoing effort to develop a system capable of preserving "vast and growing

quantities of electronic records of virtually any conceivable variety created anywhere in the Federal Government now and in the future." AR at 98 (Tab 4). NARA implemented the ERA program because its existing electronic preservation capabilities and other commercially available capabilities were inadequate for the agency to accomplish its mission. The PMO is the office that manages the actual development of the ERA program by the prime system integrator. The RFQ was issued to address the agency's continuing "need to supplement government personnel resources, expertise and skills by acquiring professional program and project management support" in the form of a Program Office Support Team ("POST"). *Id*. at 99 (Tab 4). The RFQ sought a new POST contract to replace the expiring contract for similar information technology ("IT") services.

The RFQ's Statement of Work ("SOW") identified and provided a total of sixty-four labor categories for the personnel that would comprise the support team. Thirteen of these labor categories were considered "core" personnel, whose services would be ordered against contract line item number ("CLIN") 0001.[2/] The core positions were:

1. Program Manager
2. Configuration Management Specialist
3. [Sr.] Risk Management Specialist
4. Administrative Assistant
5. Sr. Systems Engineer
6. Systems Engineer
7. Data Modeler
8. Sr. Systems Security Engineer (TS Clearance)
9. Senior Test Engineer
10. Facilities and Operations Specialist
11. Sr. Organizational Development Specialist
12. Sr. Training Specialist
13. Telecommunications Hardware Specialist

---

[2]The RFQ originally designated twenty-five labor categories as core personnel, but reduced the number to thirteen through Amendment 2 on December 1, 2006. AR at 192 (Tab 6). Shortly thereafter, the position of Risk Management Specialist was replaced with Senior Risk Management Specialist in the list of thirteen core personnel through Amendment 3. *Id*. at 218 (Tab 7).

*Id*. at 193 (Tab 6). NARA agreed to order "up to thirteen core positions" under CLIN 0001 based on available funding. *Id.* at 194 (Tab 6). The remaining fifty-one labor categories were considered optional personnel, whose services would be ordered against CLIN 0002 in the event they were needed.

The agency intended to order services on a labor-hours basis for the subject labor categories against the equivalent labor categories that were listed and priced on an offeror's General Services Administration ("GSA") Federal Supply Schedule 70. Schedule 70 is a particular multiple award schedule under GSA's Federal Supply Schedules ("FSS") program that lists numerous vendors providing a variety of IT products and services to the government. A vendor's IT services are listed for a period of time on Schedule 70 through individual schedule contracts with GSA. The labor categories offered by individual vendors are set forth in a price list incorporated into each vendor's schedule contract. The RFQ was issued to eleven such vendors with IT services listed on Schedule 70.

Offerors were required to match the sixty-four labor categories listed in the SOW with the offeror's "equivalent" or corresponding labor categories listed in their respective schedule contracts. *Id.* at 147, 161 (Tab 4). This was necessary because there was no common use of labor categories between the agency's RFQ and each vendor's schedule list.

Offerors' proposed equivalent labor categories were provided in a table of prices for each required labor category. In a series of questions and answers incorporated into the RFQ through Amendment 2, the contracting officer explained that "[a]ward will be made only against positions on the Offeror's GSA Schedule." *Id.* at 195 (Tab 5). While offerors had to have equivalent labor categories on their GSA schedule contracts to satisfy the requirement, offerors were encouraged to propose prices that were discounted from their schedule prices.

The RFQ instructed offerors to submit a quotation that consisted of two volumes. "Volume 1 Technical" consisted of a cover letter, slides that would be used during the offeror's oral presentation, personnel data forms, letters of commitment from the proposed core personnel, and past performance information. "Volume 2 Price" consisted of the offeror's table of prices and supporting data, GSA schedule contract, and financial statements.

Award of the subject task order was based on the "best overall value" to the agency. *Id.* at 167 (Tab 4). The best overall value in turn was based on an evaluation of the technical and price volumes in accordance with the stated evaluation factors and scheme:

> The basis for award is best overall value to NARA. In doing so, the Government may award to other than the lowest priced quotation or other than the highest technically rated quotation. The first factor, Achievement of Socioeconomic-Objectives, is significantly more important than the second factor, Personnel. The second factor, Personnel is significantly more important than the third factor, Understanding of the Work Statement. The third factor, Understanding of the Work Statement, is equal to the fourth factor, Past Performance. However, the technical evaluation factors, when combined, are significantly more important than price.

*Id*. The third technical factor, Understanding the Work Statement, was divided into two equal sub-factors: (a) Staff Management and (b) Corporate Experience. These sub-factors were evaluated based on an oral presentation to the agency. The oral presentations provided each offeror thirty-minutes to present its approach to staff management and its corporate experience. Offerors were instructed to submit paper copies of the slides they intended to use during the presentation. The RFQ cautioned that the "Government will consider and evaluate only the information on the transparencies that was actually presented during the oral presentation (unless the information was included otherwise)." *Id.* at 151 (Tab 4).

The first factor, Achievement of Socio-Economic Goals, was rated as either acceptable or unacceptable. The second and third factors, personnel and understanding of the work statement, were rated as either outstanding, better, acceptable, marginal, or unacceptable. The fourth factor, past performance, was rated as either outstanding, better, acceptable, marginal, or no past performance.

On December 11, 2006, NARA received five quotations in response to the RFQ. Two companies, Data Management Services, Inc. (a small business in the Small Business Administration's ("SBA") 8(a) program) and American Systems Corporation (a large business and parent company of the incumbent contractor, Integrated Computer Engineering), together submitted a quotation

as Data Management Services Joint Venture, a partnership under SBA's mentor-protege program and the plaintiff in this case.

Shortly after the receipt of quotations, members of the Technical Evaluation Team ("TET") individually evaluated the first, second, and fourth technical factors, assigning each offeror an adjectival rating. On January 17 and 18, 2007, ALON and Data Management, respectively, conducted their oral presentations before the TET. Members of the TET individually rated the offerors' oral presentation under the third technical factor.

Between March 8 and 16, 2007, the TET met to discuss the individual strengths and weaknesses of the evaluated technical volumes and presentations. The TET reached a consensus rating for each of the technical factors for each quotation and ranked the technical volumes accordingly. At the conclusion of the technical evaluations, the offerors' price volumes were revealed to the TET for evaluation. The following summarizes the technical ratings and prices of the five offerors:

| Offeror | Factor 1 Socio-Economic (Small Business) | Factor 2 Personnel | Factor 3 Understanding of the SOW | Factor 4 Past Performance | Price $ |
|---|---|---|---|---|---|
| ALON | Acceptable | Better | Better | Better | $57,510,664.85 |
| DMSJV | Acceptable | Better | Better | Better | $65,388,035.60 |
| [Offeror] | [ ] | [ ] | [ ] | [ ] | [ ] (Lowest) |
| [Offeror] | [ ] | [ ] | [ ] | [ ] | [ ] |
| [Offeror] | [ ] | [ ] | [ ] | [ ] | [ ] (Highest) |

*Id*. at 1179 (Tab 16).[3/] Further discussions were held focusing on price and technical trade-offs, culminating in a best value determination. Mr. Thomas S. Campbell, the contracting officer and source selection authority, determined

[3]Total prices were based on an assumption that all sixty-four labor categories would be ordered for the base and four option years. In the resulting task order, however, considerably fewer positions were actually ordered from ALON.

that the quotations of ALON and Data Management, the two highest rated quotations, "were technically equivalent with minor differences, thus price became much more important." *Id.* at 1180 (Tab 16). ALON's total price for the base year and four options was $7,877,370.75 less than Data Management's price. On April 6, 2007, after conducting a paired comparison between the two quotations, the source selection authority concluded that the "marginal difference in the socio-economic status, personnel, past performance, and understanding of SOW (nearly none) was not worth the premium price difference of $7,877,370.75, therefore ALON is the best value." *Id.*

On April 10, 2007, NARA issued task order NAMA-07-F-0032 against ALON's existing GSA schedule contract GS-35F-0032. On that same day, the agency notified Data Management of its award decision. On April 17, 2007, Data Management protested the evaluation of the quotations to the Government Accountability Office ("GAO"). The protest at GAO triggered an automatic stay of performance of the delivery order pending a decision from GAO. *See* 31 U.S.C. § 3553(d)(3)(A) (2000). On July 24, 2007, GAO issued a decision denying Data Management's protest on all grounds. *See Data Management Services JV*, B-299702, B-299702.2, July 24, 2007, — CPD ¶ —. Thereafter, on August 6, 2007, Data Management filed a protest in this court on similar grounds.

## DISCUSSION

### I. Jurisdiction and Standard of Review

We have jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75 (1996), to consider an action by an interested party objecting to an award of a contract and any alleged violation of a statute or regulation in connection with a procurement. We may provide any relief, including declaratory and injunctive relief, we deem proper. 28 U.S.C. § 1491(b)(2). The court's protest jurisdiction extends to protests of task or delivery orders placed against a GSA

schedule contract. *See IDEA Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135-37 (2006).[4/]

Section 1491(b)(4) directs us to "review the agency's decision pursuant to the standards set forth in section 706 of title 5." The Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000), in turn provides that we shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[5/] Thus, when reviewing the

---

[4]Although the government does not question jurisdiction, it is worth clarifying a past inconsistency in the court's treatment of the issue. In *Group Seven Assocs., LLC v. United States*, 68 Fed. Cl. 28 (2005), the court suggested that "jurisdiction [was] doubtful" with respect to protests of task orders placed against a GSA schedule contract. *Id*. at 32. That conclusion was based on the fact that the court's protest jurisdiction does not extend to the issuance of all task and delivery orders. The Federal Acquisition Streamlining Act ("FASA") of 1994, Pub. L. No. 103-355, 108 Stat. 3243 (codified in scattered sections of Title 10 and 41 of the United States Code), authorized a new type of multiple award contract called either a "task order contract" or "delivery order contract," defined at 41 U.S.C. § 253k. *See* 41 U.S.C. § 253h(a) (2000). Under this new authority, any executive agency may issue task and delivery order contracts for the procurement of services or property. These contracts are different from GSA schedule contracts, however, even though both types of contracts utilize task or delivery orders to trigger performance or delivery. One of the ways in which FASA sought to streamline the government's acquisition of supplies and services was to prohibit protests on the issuance of task or delivery orders, except in limited circumstances. *See* 41 U.S.C. § 253j(d). This limitation on protests only applies to orders issued under the newly authorized "task order contracts" or "delivery order contracts" (i.e., contracts authorized under 41 U.S.C. § 253h or 253i), *see* 41 U.S.C. § 253f, not orders placed against GSA schedule contracts. *See IDEA Int'l*, 74 Fed. Cl. at 135-37. The court's reservations with respect to jurisdiction in *Group Seven* were therefore unfounded.

[5]Plaintiff erroneously contends throughout its motion that our standard of review is based on a review of the reasonableness of GAO's decision rather than the agency's action. While we give serious consideration to GAO's reasoned explications of procurement law, its decision with respect to any

(continued...)

agency's actions, we must determine "whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). Our consideration of the agency's action is deferential, particularly in the context of a best value procurement. *Galen Medical Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("as the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to be awarded on the basis of cost alone."); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000).

II. Introduction

There are two basic grounds for the protest. First, plaintiff argues that the agency erred in its evaluation of ALON's corporate experience. Plaintiff believes that the agency improperly gave credit to ALON for having prior experience of the same magnitude as the contract being awarded. Plaintiff bases its argument on the relatively small size of ALON's prior contracts as well as on what it views as the agency's improper consideration of information relating to ALON's senior staff while failing to evaluate Data Management's senior staff. Second, plaintiff argues that ALON's quotation should have been ineligible for award because ALON offered a position from its GSA schedule contract that it contends is not equivalent to the corresponding core position of Senior Risk Management Specialist in the RFQ, thereby putting ALON's submission beyond the scope of its schedule contract.[6] We address each argument in turn.

---

[5](...continued)
particular procurement is given no deference. The one exception is when an agency follows a recommendation from GAO and the agency's action is protested in this court. In that scenario, which we do not have here, the court considers the agency's conduct in light of the GAO's recommendation in determining whether the agency's conduct was arbitrary or capricious. *See Honeywell, Inc. v. United* States, 870 F.2d 644, 647 (Fed. Cir. 1989). There, the rationality of the GAO opinion matters. Otherwise, our review is de novo.

[6]Plaintiff initially argued that ALON's equivalent position for the Senior Risk Management Specialist did not meet the minimum education requirements in the SOW. That argument was withdrawn in plaintiff's reply (continued...)

III. Evaluation of Corporate Experience

A. Similarity in Magnitude of ALON's Corporate Experience

Plaintiff argues that ALON's corporate experience is not of the same or of similar magnitude to the work required by the POST contract, thereby rendering ALON's "entire quote unacceptable" Pl.'s Reply to Def. at 17, with respect to the third technical factor, Understanding the Statement of Work. There are two sub-factors under the third factor. The only one put at issue by plaintiff's argument is "Corporate Experience."[7/] The evaluation criteria for Corporate Experience are:

> Demonstrated recent and relevant corporate experience on work of similar scope, magnitude and nature: experience in staffing on-site program management support to major systems software development or integration projects. (Oral presentation about what the firm has done).

AR at 167 (Tab 4). Plaintiff's argument hinges on the belief that "scope," "magnitude," and "nature" are independent criteria, and that "magnitude," in particular, should be viewed as an objective standard which ALON clearly failed to meet.

As reflected in its presentation slides, ALON addressed its corporate experience based on past contracts with six federal agencies: [

]. *See id.* at 410-11 (Tab 9). The size of those contracts was not furnished under the third technical factor. As plaintiff points out, however, there was an overlap in ALON's presentation between the corporations it relied on for Understanding the Statement of Work and Past Performance. The agency would have known, in other words, that the past contracts with [
] had a final and present value of less than $1 million.

---

[6](...continued)
brief.

[7]The other sub-factor is "Staff Management," which is not at issue in this case.

ALON received a "better" consensus rating for its corporate experience. The TET explained the basis for the rating:

> The offeror presented a well coordinated team, with a disciplined [Project Manager ("PM")]. Most of the comments made were focused on one project–IRS, which was a development project, not similar in scope, magnitude or nature to ERA, and not directly relevant to ERA POST needs. Although a very small business, the principals and PM had a good grasp of challenges facing ERA and had records management domain knowledge. Good understanding of technical, budget and communications challenges. The offeror demonstrated recent and relevant corporate experience on work of similar scope, magnitude and nature through their work at TSA, NWS and MDA. Senior staff has experience at hands on PM and worked on several major software programs. The offeror demonstrated good experience in staffing on-site program management support to major systems software development or integration projects.

*Id.* at 790 (Tab 15).

The TET was obviously aware of the disparity because it commented on the relative small size of the [ ] contract. The [ ] contracts would seem subject to the same characterization. Yet, the TET obviously was not troubled by that fact, giving an overall rating of "better" to ALON on its Corporate Experience. Plaintiff views this fact, not as an explanation for how the agency intended to treat the Corporate Experience sub-factor, namely, as an overall, not highly quantified, impression, but as proof that the agency ignored its own requirements.

Plaintiff insists that the RFQ established pass/fail criteria for corporate experience and that similar magnitude of work was an absolute requirement of corporate experience. Plaintiff cites the GAO's decision in its earlier protest, wherein GAO concluded that the terms of the RFQ "essentially provided that work efforts had to be similar in scope, magnitude, and nature to be considered relevant . . ." *Data Management Services JV*, B-299702, B B-299702.2, at *5. From this, plaintiff concludes that magnitude is a minimum technical requirement which ALON did not meet.

The POST contract, as awarded to ALON, has a potential five-year value of more than $57 million. In light of this obvious disparity between that amount and the much smaller prior contracts on which ALON relied, plaintiff insists that the TET was incorrect in determining that ALON had demonstrated work of a similar magnitude to the POST contract. Plaintiff supports its view by borrowing from the TET's consideration of the fourth technical factor, Past Performance, in which it noted that another offeror's prior contract worth $8 million was "much smaller [in] magnitude than the ERA POST requirements." AR at 1041 (Tab 15). If that amount was smaller in magnitude for past performance purposes, plaintiff contends, it necessarily follows that ALON's reliance on contracts of approximately $1 million made its proposal per se technically unacceptable on the third technical factor.

Defendant takes the position that we should consider the magnitude of the POST contract based solely on the value of the services ordered to date. From that perspective, the magnitude of the POST contract, including the base and four option years, would be less than $22 million because the agency did not order all of the labor categories in the RFQ. On an annual basis, that would result in approximately $4 million in orders. And, apparently for the first partial year, the agency has ordered less than $1 million in services.

At the time of evaluation, however, before any labor categories were actually ordered, the agency had to consider the possibility that the procurement would encompass all option years and all labor categories. In any event, even at $22 million, the disparity still remains. While the RFQ does not establish parameters or otherwise define what constitutes "similar magnitude" for purposes of evaluation of corporate experience, we observe, as plaintiff points out, that the TET considered other contracts worth as much as $8 million to be "much smaller [in] magnitude" in the context of past performance.[8/] AR at 1041 (Tab 15). In short, there is no blinking the fact that there is a large difference between the size of plaintiff's prior contracts and the potential size of the award.

---

[8]We are less concerned, however, about the apparent inconsistency here. The TET evaluated offerors' past performance based on the quality of their work (i.e., how they performed). The TET evaluated offerors' corporate experience, on the other hand, based on the type of work they have performed. These are not identical considerations.

While we are sympathetic with plaintiff's concerns about the agency's application of the third technical factor, we ultimately cannot agree with plaintiff's contention. We begin with an important distinction. Unlike the other three technical evaluation factors, Understanding of the Work Statement was to be evaluated solely based on an oral presentation. That fact alone, we believe, militates strongly against an overly quantified treatment of the sub-factor of Corporate Experience on work of similar scope, magnitude and nature.

The offerors were permitted, in making oral presentations, to submit presentation slides. Plaintiff, we believe, misconstrues the use of those slides. While the RFQ permitted offerors to use slides as aids to the oral presentation, it neither required them, nor prevented a presenter from making assertions beyond the slides. It merely cautioned presenters that the TET would only consider slides which had actually been discussed during the oral presentation. Plaintiff, instead, asserts that the possibility of the use of slides demonstrates such an emphasis on written materials that it should have been improper to make assertions beyond what was contained in the slides. That approach cannot be supported from the RFQ. While the use of oral representations presents problems with respect to transparency, the approach, made clear in the RFQ, would be pointless if nothing substantive could be brought forth unless previously included in a slide.

Another fact bears pointing out. Neither ALON nor Data Management provided any specific information about the "magnitude" of their prior contracts in the slides offered in connection with the oral presentation on the third factor. Indeed, Data Management is only able to make the assertions it does about the non-comparability of ALON's prior contracts from information ALON provided in connection with the fourth technical factor, Past Performance.

We can tell from Data Management's own slide presentation, however, that it considered small contracts to be relevant to establishing its corporate experience. On its slide entitled "Corporate Experience," plaintiff listed five contracts indicating specific areas in which they were relevant to the work to be performed under the POST contract. *Id*. at 618 (Tab 10). Noticeably absent from the slide are the dollar values of those contracts. In addition, earlier in its presentation, in a slide entitled "DMSJV Valued Customers," plaintiff listed 18 different contracts with a total cumulative value of $20,674,000. *Id*. at 601 (Tab 10). A simple mathematical division produces an average contract value

of approximately $1,149,000. Plaintiff's own slides thus indicate its view that the contracts of a relatively small magnitude were relevant to corporate experience.

It is true that plaintiff, by virtue of its status as a joint venture, was able to point to the fact that American Systems Corporation, the larger constituent element of the joint venture, was the incumbent contractor. Plaintiff suggests that the agency therefore obviously knew that American Systems had experience with larger contracts. This fact would have appeared in writing, as plaintiff points out, in connection with its written submission for the fourth technical factor, Past Performance. Borrowing from its submission in that respect has a down side for plaintiff, however. As intervenor points out, the RFQ carries the following instruction: "If the prime Contractor or its subcontractors have no past performance history in the requisite contract amount, the Offeror may submit information on past performance at lower dollar levels . . . ." *Id*. at 145 (Tab 4). Plainly the agency contemplated that an offeror might have no corporate experience of a similar magnitude to the subject contract. That is particularly understandable, as it gave highest priority to obtaining a small business contractor.

There is an additional reason we reject the argument that the individual elements listed under the Corporate Experience evaluation criteria are, as intervenor argues, "minimum acceptability standards." Int.'s Mot. at 3. The language of the RFQ is expressed in considerably softer terms. The words "based on," "demonstrated," "relevant," and "similar" are not words of precision. Moreover, even plaintiff does not suggest that the words "scope" and "nature" are subject to quantification. There are no words of limitation in this sub-factor. Plaintiff is then left with the argument that the word "magnitude," unlike its sister requirements, is uniquely objective and subject to an otherwise unexpressed numerical standard.

Instead, we believe intervenor is correct in arguing that the court should consider the rationality of the TET's evaluation of "magnitude" of prior contracts as part of a collective impression, partially subjective, which represents the agency's discretionary judgment, based on an oral presentation. In view of the fact that the TET left itself with the right to exercise judgment in connection with assigning a blended rating to this sub-factor and that it was obviously aware of the relative sizes of the various contracts, we conclude that it would be an usurpation of the agency's role to find error here.

B. Information Not Presented in Writing

We also disagree with plaintiff's argument that the TET did not sufficiently document its consideration of ALON's [ ] contract and the experience of ALON's senior staff. The relevant regulation at FAR 8.405–2(e)[9] lists the minimum documentation required for services ordered against an FSS contract. With respect to the evaluation of quotations, the FAR only requires that agencies document the "rationale for any tradeoffs in making the [award] selection." FAR 8.405–2(e)(5).[10]

Here, not only did the source selection authority document the agency's tradeoffs in selecting ALON over Data Management for award, *see*, *e.g.*, AR at 1180 (Tab 16), but the TET also documented its evaluation of the oral presentations. When describing the strengths of ALON's corporate experience with respect to its [ ] contract, individual evaluators included such comments as: "Relevant PMO support at [ ]," *id*. at 792 (Tab 15), "PMO support for [ ]," *id*. at 793 (Tab 15), and "Experience providing support staff for various agencies . . . [including] [ ]." *Id.* at 798 (Tab 15). With respect to ALON's senior staff, one evaluator noted that the "[s]enior staff has experience at hands on PM and were worked on several major software program [sic], provided good lessons learned." *Id.* at 792 (Tab 15). Thus, the TET documented the strengths it observed in ALON's corporate experience. The TET was not obligated, as plaintiff contends, to describe in detail the scope, magnitude, and nature of the experience for which it was giving ALON credit. It is sufficient that the TET heard ALON's presentation and documented its contemporaneous impressions.

C. Unequal Treatment of Offerors

Plaintiff's final argument with respect to treatment of the third technical factor is that the TET unfairly favored ALON by evaluating the work background of its corporate principals without considering the personal experience of Data Management's corporate principals. Plaintiff argues that its president and chief financial officer were present at the oral presentation,

---

[9]The Federal Acquisition Regulation ("FAR") is codified in Title 48 of the Code of Federal Regulations.

[10]To the extent plaintiff relies on language in FAR Part 15, that part does not apply to orders placed against FSS contracts. *See* FAR 8.404(a).

but were "not invited by NARA to present their individual experience." Pl.'s Reply to Int. at 17. Plaintiff explains that it did not submit information in its written quotation concerning the experience of its senior corporate personnel because "the RFQ did not indicate that the information would be evaluated." *Id.* at 18. Plaintiff suggests that if it had known that the TET "would evaluate corporate principals, it could have submitted their resumes." Pl.'s Reply to Def. at 17-18.

Plaintiff's concern appears to arise from the language used by the TET in its evaluation of the two quotations. The TET makes favorable comments with respect to the experience of ALON's "senior staff," *see* AR at 790 (Tab 15), but makes no reference to the "senior staff" of Data Management. *See id.* at 852 (Tab 15). Instead, the TET noted simply that Data Management's "[o]wner demonstrated good understanding of requirements." *Id.* Plaintiff would have us believe that the TET's failure to evaluate its "senior staff," as it did with respect to ALON, is an instance of unequal treatment. We disagree.

Corporate Experience is only a sub-factor of the third evaluation factor, Understanding of the Work Statement. Thus, the positive corporate experience of senior staff is relevant to demonstrating that the offeror understands the work requirements. The TET found that Data Management's owner demonstrated a good understanding of the SOW's requirements. Data Management was, therefore, given credit for the experience of its owner, just as ALON was given credit for the experience of its senior staff. Moreover, plaintiff's suggestion that ALON submitted, and the TET considered, written resumes of ALON's senior staff is not supported in the record. There is no evidence that ALON submitted such resumes or that the TET considered any written materials other than ALON's presentation slides as part of its evaluation of ALON's corporate experience.[11]

---

[11]Plaintiff argues that it is unfair for the agency to evaluate personnel under the corporate experience sub-factor without informing offerors that it would do so. In making that argument, plaintiff relies in part on GAO's decision in *Beneco Enterprises, Inc.*, B-283512.3, July 10, 2000, 2000 CPD ¶ 176. GAO decisions are not binding on this court, but the principle enunciated in that case is, in any event, unrelated to the present case. In that case, the solicitation informed offerors that in the event an offeror was a newly formed entity without past contracts, the agency would consider the past performance (continued...)

With respect to the suggestion that the RFQ should have notified offerors that it could tout the experience of its corporate principals, we believe that the competitive world of government contracting remains sufficiently Darwinian that it should have been obvious to any offeror that it could take advantage of the oral presentation to promote its management team.

## IV. Core Position of Senior Risk Management Specialist: Scope of Federal Supply Schedule

Plaintiff argues that ALON was ineligible for award because ALON proposed a labor category from its GSA schedule that is not the equivalent of the Senior Risk Management Specialist labor category, one of the thirteen core positions described in the RFQ. In other words, plaintiff argues that the agency improperly ordered services from ALON that were not within the scope of ALON's schedule contract. The RFQ provided the following position description for the Senior Risk Management Specialist:

**CATEGORY 8. SENIOR RISK MANAGEMENT SPECIALIST (or equivalent)**

| | |
|---|---|
| FUNCTION: | Implements ERA Risk Program including support to the Risk Review Boards and Risk Review Teams. Facilitates formal Risk Management meetings. Manages operations of risk management tools. Develops risk scenarios and assesses impact on schedule, cost and program mission. Reviews ERA risk related deliverables from ERA PSI Contractor. Writes or updates ERA Program Management Risk Plans, procedures, and processes. Performs other tasks as directed. |
| DESIRED EDUCATION: | Bachelor's Degree (BA/BS) in Business Administration, Public Administration, Engineering or related field. Eight years progressively responsible experience with increasingly more complex or difficult assignments may be substituted for educational requirement. |
| DESIRED GENERAL EXPERIENCE: | Twelve years experience in planning or performing project or program risk analysis and management efforts. |

---

[11](...continued)
of an offeror's key personnel in lieu of the company's past performance. GAO sustained the protest in part because it determined that the awardee was not, in fact, a newly formed entity, and, therefore, it was improper for the agency to consider the past performance of its formed entity and key personnel. *See id*.

| | |
|---|---|
| DESIRED SPECIALIZED EXPERIENCE: | Two years experience in facilitating risk review meetings and in applying currently available risk management tools such as @Risk and Risk Radar on project plans, technical approaches, project schedule or cost estimation. |

*Id*. at 109 (Tab 4). For this required labor category, ALON proposed a position entitled Senior Requirements Analyst from its GSA schedule, GS-35F-0325R. ALON's GSA schedule provides the following description for the Senior Requirements Analyst:

> **004 Commercial Job Title: Senior Requirements Analyst**
>
> Minimum/General Experience: 10 years experience gathering requirements for business and technical solutions. Must have strong writing and communications skills and the ability to interface with senior and executive management. Must be knowledgeable with the implementation of applicable Government mandates such as the President's Management Agenda and the Federal Acquisition Regulations (FAR). Master's degree is equivalent to two (2) years experience.
>
> Functional Responsibility: Duties may include conducting process or requirements analysis, supporting IT systems development with subject matter knowledge, assisting in IT procurement, performing system audits, conducting training, and assisting in the preparation of management and financial reports and presentations.

*Id*. at 455 (Tab 9). Plaintiff points out that the description of the function of ALON's Senior Requirements Analyst position does not include risk management. Plaintiff thus believes that the agency ordered services not on ALON's schedule contract. Plaintiff contends that, not only was such an award beyond the scope of ALON's schedule contract, but it also violated the contracting officer's statement that "[a]ward can and will be made only against positions on the Offeror's GSA Schedule." *Id*. at 195 (Tab 6).

Defendant argues, however, that ALON's Senior Requirements Analyst position is sufficiently related to the RFQ's Senior Risk Management Specialist position to be permissible. Defendant explains that the risks being managed on the ERA program "involve the implementation and procurement of a major IT system." Def.'s Mot. at 36. Defendant thus believes that it was

reasonable for the agency to find ALON's requirements analyst as an equivalent position because the requirements analyst supports IT systems development, assists in IT procurement, and performs system audits, all of which are characteristics of the individual who must manage the risks associated with the ongoing procurement of the ERA system. Intervenor also contends plaintiff's argument is misplaced because plaintiff is focusing on the title and brief job function of ALON's proposed "equivalent" labor category. Intervenor essentially argues that the agency's primary focus should be on the qualifications of [ ], the individual ALON proposed to fill the position of Senior Risk Management Specialist, not on the extent to which the position descriptions matched. Intervenor argues that "matching" occurred in connection with the second technical evaluation factor, "Personnel." It contends that [ ] "greatly exceeded the description of the Senior Risk Management Specialist in the RFQ." Int.'s Mot. at 14.

The FSS program provides federal agencies with a "simplified process for obtaining commercial supplies and services at prices associated with volume buying." FAR 8.402(a). Orders placed against FSS contracts are not subject to FAR Part 15, which prescribes procedures for most negotiated contracts. *See* FAR 8.404(a). As long as orders are placed against schedule contracts using the procedures in FAR Subpart 8.4, however, those orders are "considered to be issued using full and open competition." *Id.* When an agency elects to order services against a schedule contract, it "shall not seek competition outside of the Federal Supply Schedules or synopsize the requirement." *Id.* Use of the FSS program is an alternative form of "competitive procedures," which are generally required by statute for all government contracts. *See* 41 U.S.C. § 253; 10 U.S.C. § 2304(a)(1).

In this case, the agency elected to restrict competition to only those vendors offering services on Schedule 70. That restriction on competition is permissible as long as the agency orders services that are actually on Schedule 70.[12] By ordering services that are not on Schedule 70, the agency would be

---

[12]"Where an agency announces an intention to order from an existing GSA Schedule contractor, it means that 'the agency intends to order all items using GSA FSS procedures and that all items are required to be within the scope of the vendor's FSS contract.'" *IDEA Intern.*, 74 Fed. Cl. at 139 (quoting *Tarheel Specialties, Inc.*, B-298197 et al, 2006 WL 2820577 at *3 (continued...)

seeking, and obtaining, competition outside of the FSS program. Such competition would undermine the agency's stated intention to order services only from offerors' individual schedule contracts. It would also unfairly benefit companies which do not offer the required schedule services by providing them an opportunity to compete for an award that was not available to other similarly situated vendors.

Here, all of the offerors had professional IT labor categories on Schedule 70. The agency ultimately awarded the task order to ALON, ordering position number 004, "Senior Requirements Analyst," from ALON's GSA schedule contract to fill the SOW's Senior Risk Management Specialist position. *See* AR at 1214 (Tab 18). In a literal sense, then, the agency ordered services from ALON's Schedule 70 contract and, thus, the competition was not outside of the FSS program.

Additionally, although plaintiff is correct in pointing out that the stated function of ALON's Senior Requirements Analyst does not specifically mention the task of risk management, it is certainly plausible that a requirements analyst would be in a position to manage the risks related to the development of the ERA program. Perhaps more importantly, the function of the Senior Risk Management Specialist is consistent with the function of ALON's Senior Requirements Analyst in that both positions require an understanding of the system requirements of the ERA program.[13/] In this

---

[12](...continued)
(Comp. Gen. July 17, 2006).

[13]Although not a contemporaneous justification, the contracting officer explained the rationale in his statement of facts in plaintiff's earlier protest at GAO:

> A background or strong familiarization with Requirements Analysis would benefit the POST Senior Risk Management Specialist as one important area of risk management involves requirements analysis. The Senior Risk Management Specialist position requires a program office skill set and the proposed [ALON] Senior Requirements Analyst fulfills the requirements of a Senior Risk Management Specialist. Thus, [ALON] reasonably quoted Item 004 Commercial Job Title: Senior

(continued...)

regard, we believe the position of the Senior Risk Management Specialist is, broadly speaking, within the scope of ALON's IT schedule contract and, therefore, eligible for award.

Plaintiff's argument is, in any event, somewhat ironic. A review of plaintiff's own table of prices reflects how protean are the positions on its GSA schedule in relation to the positions required by the RFQ. For example, plaintiff used its GSA schedule position of "Systems Engineer" as a sort of catch-all equivalent for six unique labor categories described in the RFQ, including the key position of Senior Risk Management Specialist.[14/] *See id*. at 647-49 (Tab 10). Curiously, for the positions of Senior Systems Engineer and Systems Engineer (two of the thirteen core positions in the RFQ), plaintiff selected "IT/IM Functionality Expert" and "Principal Systems Architect" as the "equivalent" positions on its GSA schedule, not the "Systems Engineer" position already used for six different positions. *See id*. at 647 (Tab 10). Indeed, plaintiff only has twenty-four defined labor categories on its GSA schedule, yet it was able to offer "equivalent" positions for all sixty-four labor categories in the RFQ by using certain categories multiple times. In that regard, plaintiff's own quotation is illustrative of the less-than-scientific exercise of matching labor categories that do not directly correspond to categories created by the agency and tailored to its needs.

We find little difference in the way Data Management matched its equivalent labor category to the Senior Risk Management Specialist in the SOW and what it complains of with respect to ALON. Data Management's Systems Engineer includes a vast number of general experience skills:

---

[13](...continued)

> Requirements Analyst . . . to perform the required duties of a Senior Risk Management Specialist.

AR at 1436-37 (Tab 27).

[14]Data Management offered its "Systems Engineer" position as the equivalent labor category for the Senior Configuration Management Specialist, Senior Risk Management Specialist, Systems Security Engineer, Senior Test Engineer, Security Specialist, and Telecommunications Hardware Specialist.

> **#7) Systems Engineer**
>
> **Minimum/General Experience:** Over six years of experience in a senior level technical position that requires exercising independent judgment and technical discretion when providing technical support in any combination of the following areas: system architecture, system/equipment design, system integration, technical management, and direct interface with customer management personnel for the solution of emergent engineering and technical problems; and total quality management review of system (hardware and computer software). Evaluates and develops technical input to the systems engineering process. Performs requirements analysis for systems missions and environments to identify functional definitions and designs for system hardware and software architecture. . . . Provides process measurement, assessment, and decision mechanisms required to evaluate design capabilities and document system design and decision data. These mechanisms include trade-off studies; effectiveness analyses; *risk management*, configuration management, data management; and performance-based progress management, including systems engineering master and detailed schedules, technical performance, design reviews and audits. . . .
>
> **Functional Responsibility:** Develops and delivers engineering management plans, monitors schedule execution, and integrates/develops recommendations for corrective action and remedial action; prepare status reports reflecting engineering/technical milestones, progress, and problems; provides technical guidance and experience to junior personnel for development/delivery of engineering designs and documentation.

*Id*. at 676 (Tab 10) (emphasis supplied). Thus, the stated functional responsibility of Data Management's Systems Engineer, on its face, is no more related to "risk management" than the functional responsibility of ALON's Senior Requirements Analyst. The wide range of "minimum/general experience" required is not unlike ALON's Senior Requirements Analyst. A minor reference in the general experience section to risk management can hardly be characterized as controlling. The reference does not appear in

connection with the function of the position. At the very least, then, Data Management was not prejudiced because the agency was equally flexible in accepting its Systems Engineer.

Offerors were given considerable latitude in selecting "equivalent" positions from their GSA schedules in this procurement. The fact that the RFQ asked offerors to identify the "equivalent" labor category, without defining the term or providing any additional criteria, indicates that the agency understood that there might not be a perfect correspondence between the labor categories on an offeror's schedule contract and the RFQ. Offerors would therefore have to exercise their judgment.

We believe that Intervenor's explanation is correct, namely, that there is a great deal of self-certification in the "mapping" process and that it is primarily a device for assigning maximum prices. Mapping of labor categories is required only in the "Pricing Volume" (Volume II), which is entirely separate from the technical considerations of Personnel found in "Volume I." *Id*. at 143-48 (Tab 4).

Instead, the agency is able to assure its ability to obtain what it really needs by way of services through the second technical evaluation factor, Personnel. The factors for evaluation required the TET to examine the quality and availability of the proposed personnel as reflected in the personnel data forms and letters of commitment submitted as part of the technical volume. Specifically, the TET was required to assess the qualifications and experience related to the work statement of each of the proposed core personnel. The record reflects that the agency did that.

During its evaluation of [ ], ALON's selection for the Senior Risk Management Specialist position, some of the members of the TET found weaknesses with respect to her "risk management" experience.[15/] For example, the evaluators documented such weaknesses as: "specialized experience for Risk [Management] person not risk related," *id.* at 784 (Tab 15), "Risk [Manager] – Specialized experience does not mention Risk [Management] tools. Lacks financial risk [management] experience," *id.* at 786 (Tab 15), the risk manager has "very little risk management experience," *id.*, and

---

[15]This is contrary to intervenor's argument that she "greatly exceeded" the description of the position.

"significant weaknesses were found with the Risk Manager who had very little risk management experience." *Id*. at 789 (Tab 15). One evaluator found the lack of risk management experience less of a concern, noting that "not as significant are the lack of specialized risk related experience by risk [manager]." *Id*. at 785 (Tab 15). Another evaluator found strengths in the proposed Senior Risk Management Specialist, noting: "Risk [Manager] – Extensive project [management] experience. Knowledgeable of PM process and Risk Radar tool." *Id*. at 786 (Tab 15). It is thus apparent that the agency took both of these weaknesses and strengths into account when it determined that, as a whole, ALON's proposed personnel should be rated as "better" instead of "outstanding."

The competition was not unfair. Both Data Management and ALON offered services on Schedule 70 that were matched consistently with the requirements of the SOW. Ultimately, the agency is getting the capabilities it solicited. Any subsequent disputes over performance in accordance with the SOW is a contract administration matter.

CONCLUSION

In light of the broad discretion we afford the contracting officer in a best value procurement, *see Galen Medical Assocs., Inc.*, 369 F.3d at 1330, we find the agency's evaluation and subsequent award decision both rational and lawful. We therefore deny plaintiff's motion for judgment on the administrative record, and grant defendant and intervenor's cross-motions. Plaintiff's request for injunctive relief is denied as moot. The Clerk is directed to dismiss the complaint. No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge